# XEROX CORPORATION *v.* COMPTROLLER OF THE TREASURY, INCOME TAX DIVISION

[No. 79, September Term, 1980.]

*Decided April 21, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*James P. Garland* and *Herman B. Rosenthal,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellant.

*Gerald Langbaum, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

This case presents the question whether Maryland taxation of an apportioned amount of certain interest and royalty

income earned by a corporation engaged in both interstate and intrastate commerce was proper under relevant statutory and constitutional standards. More specifically, the issue is whether the Comptroller of the Treasury was correct in levying an assessment of additional corporate income tax upon Xerox Corporation for the tax years 1972, 1973 and 1974, based upon inclusion within Xerox's taxable income of interest earned on loans made to foreign subsidiaries and on royalty income received from licensing arrangements made with foreign subsidiaries and nonaffiliated domestic and foreign corporations.

## I

It is well established that the entire net income of a corporation, generated by interstate as well as intrastate activities, may, within constitutional limits, be fairly apportioned among the states for tax purposes by formulas utilizing in-state aspects of interstate affairs. *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980); *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S. Ct. 357, 3 L. Ed. 2d 421 (1959). In Maryland, a corporation's net income for state tax purposes is "the taxable income of such taxpayer as defined in the laws of the United States . . . ." Maryland Code (1957, 1980 Repl. Vol.), Article 81, § 280A (a). Certain additions to and subtractions from federal taxable income are set forth in § 280A (b) and (c). At the time relevant to this case, § 280A (c) (4) permitted subtraction from taxable income of

> "dividend income to the extent included in taxable income and any interest income other than interest earned in the conduct of a business, on loans made under the provisions of Article 58A of this Code, and interest earned on business accounts, notes receivable and installment contracts." [1]

---

1. Section 280A (c) was substantially revised by ch. 637 of the Acts of 1976; the revision permitted subtraction of interest income only on obligations of the United States and its instrumentalities.

Section 316 of Art. 81 further prescribes the manner in which the net income of a corporation shall be calculated for purposes of state taxation. Under § 316 (a) and (b), certain adjustments for income from real or tangible personal property and for capital gains and losses are to be made to federal taxable income. Section 316 (c) provides that the remaining net income of a corporation, referred to as "business income,"

> "shall be allocated to this State if the trade or business of the corporation is carried on wholly within this State, but if the trade or business of the corporation is carried on partly within and partly without this State so much of the business income of the corporation as is derived from or reasonably attributable to the trade or business of the corporation carried on within this State, shall be allocated to this State and any balance of the business income shall be allocated outside this State. . . ."

Section 316 (c) also provides that the portion of the business income

> "derived from or reasonably attributable to the trade or business carried on within this State may be determined by separate accounting where practicable, *but never in the case of a unitary business* . . . ." (Emphasis supplied.)

Where separate accounting is neither permissible nor practicable, § 316 (c) provides that the portion of the business income of the corporation allowable to this State

> "shall be determined in accordance with a three-factor formula of property, payroll and sales, in which each factor shall be given equal weight and in which the property factor shall include rented as well as owned property and tangible personal property having a permanent situs within this State and used in the trade or business shall be included as well as real property."

It is thus clear that when separate accounting is not permitted under § 316 (c) — as with the business income of a unitary business — a corporation must compute its Maryland tax liability by using a three-factor (sales, property and payroll) apportionment formula, each "factor" being a fraction. The numerator of the sales factor, for example, is the amount of a corporation's in-state sales; the denominator of the sales factor is the total amount of a corporation's in-state and out-of-state sales. The property and payroll factors are computed in the same manner. The three factors are averaged and the resulting fraction, expressed as a percentage, is multiplied by the corporation's business income. The resulting dollar amount constitutes the business income apportioned to this State. The applicable tax rate is then applied to the corporation's apportioned income.

## II

Xerox Corporation is incorporated under the laws of New York and has its principal place of business in Rochester, New York. It is divided into operating divisions, some of which are in turn combined into groups. The copier division is headquartered in New York, and the corporate headquarters and education division are located in Stamford, Connecticut. Xerox conducts business in all fifty states and the District of Columbia, and has branch offices in several territories of the United States (Puerto Rico, Guam, Samoa, and the Virgin Islands). Xerox's business consists primarily of the manufacture of copying equipment, which it sells and rents to its customers. Xerox also provides maintenance services to its customers.

The activities conducted by Xerox in Maryland are primarily in connection with the sale, rental and maintenance of its copying machines, which are manufactured in New York. Xerox has no research or development facilities in this State. Control and supervision of Xerox's copier business activities in Maryland is exercised by personnel in a regional headquarters in Virginia. A branch office, located in the Baltimore metropolitan area, rents and sells Xerox copying

machines and equipment and provides maintenance services. Xerox's education division maintains a small facility in Cheverly, Maryland, from which it distributes educational materials.

Xerox filed timely Maryland corporate income tax returns with the Comptroller for tax years 1972, 1973 and 1974. These returns reflected an apportionment of Xerox's net income to the State of Maryland from the manufacture, sale, rental and service of its machines. The apportionment was made under the Maryland apportionment formula on the basis of Xerox's property, payroll and sales in Maryland as compared to the same factors at all locations within and without Maryland. Before applying the Maryland apportionment formula, Xerox subtracted from its net income certain royalty and interest income that it had received during the tax years in question.

The royalty income was comprised of license fees that Xerox charged for use of certain of its intangible assets, *i.e.,* patents, trademarks, copyrights and business know-how. The license fees, which were determined as a percentage of certain sales of the licensees, were received from various corporations. Approximately 86% of Xerox's royalty income came from foreign subsidiaries, with the balance coming from foreign (10%) and domestic (4%) nonaffiliated corporations. An average of almost 90% of Xerox's royalty income in each of the tax years involved was generated by fees charged to foreign subsidiaries for the use of Xerox's name. None of the licensing agreements was entered into in Maryland, nor were any of the intangible assets that generated the royalty income acquired or developed in this State. The documents evidencing Xerox's ownership of the intangible assets were kept at its facilities in Connecticut and New York. Personnel in Xerox's corporate headquarters in Connecticut and New York administered the terms of the licensing agreements and collected the licensing fees.

Xerox's ownership interest in the foreign subsidiaries that paid the license fees ranged from 15% to 100%. All of these corporations conducted their businesses entirely outside of the United States and its territories. Each was a separate

corporation under foreign law and each had its own local management. Xerox received $11,368,714, $19,148,281, and $20,702,118 in license fees in 1972, 1973 and 1974, respectively.

The interest income was produced by loans that Xerox made to certain of its foreign subsidiaries. Although the subsidiaries usually borrowed money in the regular commercial market, Xerox made loans to these corporations when, for example, a subsidiary was precluded from borrowing in its own right by restrictions in existing loan agreements. The loans made by Xerox were all evidenced by formal loan documents and carried various interest rates, depending upon market conditions and the prevailing rate of interest when the loans were negotiated. The formal loan documents pertaining to these loans were executed in jurisdictions outside of the State of Maryland and were administered by personnel at Xerox's headquarters in Connecticut. For the years 1972, 1973 and 1974, the foreign subsidiaries had long-term debts outstanding in the regular commercial market of $205,617,000, $258,738,000, and $370,384,000, respectively. Indebtedness from Xerox's foreign subsidiaries to Xerox was $29,085,084, $59,324,565 and $77,669,226 at the end of tax years 1972, 1973 and 1974, respectively.

The Comptroller conducted audits of Xerox's Maryland corporate income tax returns for 1972, 1973 and 1974. Xerox's subtraction of the interest and royalty income was disallowed, and a formal assessment of $102,559 was issued in 1977. In computing the amount of tax owed by Xerox, the Comptroller modified the apportionment formula by including net interest and royalty income in the denominator of the sales factor and the net book value of Xerox's copyrights and patents in the denominator of the property factor. Xerox appealed the assessment to the Maryland Tax Court.

The Tax Court affirmed the assessment, finding that there was "no dispute ... that Xerox is a unitary business." It rejected Xerox's argument that the interest income involved was exempt from Maryland taxation under § 280A (c) (4) of Art. 81, concluding that it was "business income" and therefore taxable under the statute. The Tax Court also

ruled that taxation of the interest and royalty income did not, as claimed by Xerox, violate either the Due Process or Commerce Clauses of the United States Constitution. Xerox's contention that a "nexus" between the specific income to be taxed and the taxing state is constitutionally required was rejected. Referring to the tests announced in *Moorman Manufacturing Co. v. Bair,* 437 U.S. 267, 98 S. Ct. 2340, 57 L. Ed. 2d 197 (1978), the Tax Court said:

> "There is a 'minimal connection' — Xerox has outlets here. The income attributed is 'rationally related' to Xerox' values connected to Maryland — it reflects the average of the value of Xerox' property, payroll and sales in Maryland as compared to Xerox total values. And finally, Petitioner has failed to show any 'gross distortion' of its tax liability."

The Tax Court concluded that the apportionment formula used by the Comptroller was proper and resulted "in the taxation of no more than this State's fair share of Petitioner's income."

Xerox appealed the Tax Court's decision to the Circuit Court for Baltimore County. That court expressed the belief that *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980), was controlling and required affirmance of the Tax Court's decision. Language in § 316 (c) of Art. 81, which according to Xerox required a stronger showing of a connection between the income to be taxed and the taxing state than that constitutionally required under relevant Supreme Court decisions, was interpreted as mandating nothing more than "the application to the total income of a corporation of a reasonable apportionment formula . . . ." Finally, the circuit court held that the apportionment formula used by the Comptroller was fair and reasonable. Xerox appealed to the Court of Special Appeals, and we granted certiorari prior to determination of the case by the lower appellate court to consider the important issues involved.

As it did below, Xerox advances three major arguments. First, that Art. 81, §§ 280A (c) (4) and 316 (c), prohibit Maryland taxation of any part of the interest and royalty income. Second, that Maryland's taxation of the interest and royalty income offends both the federal and state constitutions. Third, that even if Maryland has the constitutional and statutory authority to tax the interest and royalty income, the formula used to determine Xerox's Maryland tax liability was constitutionally invalid.

Xerox concedes that it operates a "unitary" business in the United States and its territories, and that Maryland properly could tax a portion of the income derived from that business. Xerox contends, however, that the royalty and interest income was derived from sources totally separate and distinct from its copier business and other active business operations in which it was engaged; that the income was thus not a part of the unitary business which it conducted in part in Maryland; and that such income, therefore, was properly allowable outside of the State for tax purposes. Xerox further contends that there was a complete absence of the requisite interdependence among its copier activities and royalty and interest income-generating activities. The absence of an underlying unitary business, Xerox argues, means that separate accounting rather than apportionment is mandated by § 316 (c). The Comptroller suggests that the identity of the payor corporations is irrelevant to the question whether separate accounting is proper under § 316 (c). The fact that Xerox conducted a unitary copier business, a part of which it conducted in Maryland, is sufficient, he urges, to preclude the use of separate accounting under § 316 (c).

Xerox contends that the interest income was nonbusiness income and therefore excludable from Maryland net income under former § 280A (c) (4). In addition, Xerox argues that Maryland taxation was limited, as provided by § 316 (c), to

"so much of the business income of the corporation as is derived from or reasonably attributable to the trade or business of the corporation carried on within this State . . . ."

This legislative standard, Xerox argues, is more restrictive than the constitutional standard and was not met with respect to the interest and royalty income. As a consequence, Xerox contends that Maryland has no jurisdiction to tax that income. The Comptroller submits that the Legislature intended that § 316 (c) be used to tax as much of a corporation's income as is constitutionally permissible. The interest income should not be excluded under § 280A (c) (4), he maintains, because it was earned in the conduct of Xerox's business.

Even if there is no statutory bar to Maryland taxation of the interest and royalty income, Xerox contends that the due process and commerce clauses prohibit taxation of this income. It argues that the federal constitution requires a direct nexus between the income to be taxed and the taxing state, a nexus that is missing in this case. The Comptroller denies that a direct nexus is required, and submits that under traditional notions of due process there is no constitutional impediment to Maryland taxation of the interest and royalty income. In the alternative, the Comptroller argues that Xerox failed to demonstrate that it did not form a unitary business with its foreign subsidiaries, and therefore the interest and royalty income is taxable under the Supreme Court's decision in *Mobil Oil Corp. v. Commissioner of Taxes, supra.*

The apportionment formula applied by the Comptroller is also attacked by Xerox on the ground that by failing to apportion its income in a rational manner, the Comptroller acted unconstitutionally. The Comptroller characterizes the use of the modified apportionment formula as fair and reasonable, and rejects each of the alternative formulas advanced by Xerox.

## III

### A.

As previously indicated, net income for Maryland corporate taxpayers is defined in § 280A (a) as "the taxable income of such taxpayer as defined in the laws of the United

States . . . ." Section 280A (c) (4) provides for the subtraction from federal net income of

> "any interest income other than interest earned in the conduct of a business, on loans made under the provisions of Article 58A of this Code, and interest earned on business accounts, notes receivable and installment contracts."

The determination of whether Xerox's interest income is taxable under § 280A necessitates consideration of whether § 280A (c) (4) is a "definition" of taxable income, and therefore to be construed strictly against the State, or an "exemption" from taxable income, to be construed in favor of the State.

In *Balto. Foundry v. Comptroller,* 211 Md. 316, 127 A.2d 368 (1956), the taxpayer argued that the purchase of certain goods, which it used in its foundry operations and then sold to its customers, did not constitute a "retail sale" subject to taxation under the then-existing version of the Retail Sales Tax Act. Section 320 of that Act defined, among other relevant terms, "retail sale," and § 321 described the tax consequences of transactions that fit within the various definitions set out in § 320. Section 322 was titled "Exemptions" and listed a number of transactions that would be exempt from taxation even though otherwise within the scope of § 320. With this factual and statutory scheme before it, the Court said:

> "It may be observed that the exclusion of tangible personal property purchased for the purpose of resale in its original form, or for the purpose of incorporation into a finished product, is by force of the definition and not by inclusion in the exemptions set out in sec. 322. Sales in the categories mentioned are simply not within the scope of the taxing statute. Thus the rule of strict construction of an exemption does not apply, but the rule is applicable, that, where there is doubt as to its scope, a tax statute should be construed most strongly in

favor of the citizen and against the State." 211 Md. at 319-20, 127 A.2d at 369.

Xerox argues that the statutory construction rules of *Balto. Foundry, supra,* are applicable to the present case, but we cannot agree that § 280A (c) (4) is part of a "definition" of taxable income. The scope of Maryland taxation of corporate income as defined in § 280A (a) encompasses the corporation's federal taxable income. Under § 280A (c) (4), interest income is to be subtracted from federal income unless it is derived from a certain source, such as notes receivable. Interest income is therefore within the scope of the taxing statute and is to be taxed unless excluded by operation of § 280A (c) (4). That section, therefore, must be viewed as an exemption. *See Swarthmore Co. v. Comptroller,* 38 Md. App. 366, 371, 381 A.2d 27, 29 (1977). As such, the following rules are applicable in determining whether Xerox's interest income is taxable under § 280A (c) (4):

> "It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and if any real doubt exists as to the propriety of an exemption that doubt *must* be resolved in favor of the State. In other words, 'to doubt an exemption is to deny it.' ... [T]he State's taxing prerogative is never presumed to be relinquished and the abandonment of this power must be proved by the party asserting the exemption."

*Perdue v. St. Dep't of Assess. & T.,* 264 Md. 228, 232-33, 286 A.2d 165, 167-68 (1972) (emphasis in original) (citations omitted) (quoting from *Suburban, etc. Gas Corp. v. Tawes,* 205 Md. 83, 87, 106 A.2d 119, 121 (1954)).

Xerox has attempted to meet the burden of proving the State's relinquishment of its power to tax interest income by urging us to hold that § 280A (c) (4) only permits taxation of interest income directly attributable to the type of business operations conducted by the taxpayer in this State. Thus, while Xerox concedes that it must pay Maryland income taxes on the receipt of interest related to its copier operations, both within and without the State, it contends

that § 280A (c) (4) precludes taxation of the interest received on loans to foreign subsidiaries. In *Swarthmore Co. v. Comptroller, supra,* the Court of Special Appeals considered the taxability of interest income under § 280A (c) (4). Observing that the language of § 280A (c) (4) was ambiguous, the court sought to ascertain the Legislature's intent by looking to subsequent legislative revisions of § 280A (c). The court noted that the language of § 280A (c) (4) was eliminated by ch. 637 of the Acts of 1976. The title to that Act stated that its purpose was to include "in the income of corporations subject to State income tax certain nonbusiness interest . . . income to the same extent included under the federal income tax . . . ." Section 280A (c) (4), prior to its revision, was intended, the court concluded, "to assure that 'interest earned in the conduct of a business' be taxed, with only specified kinds of *nonbusiness interest income* being exempt." 38 Md. App. at 372-73, 381 A.2d at 30 (emphasis in original).

It was the holding of the Tax Court that Xerox's loans to its subsidiaries generated business income. Because it appears that § 280A (c) (4), as it then stood, was intended to exempt only nonbusiness interest income, and bearing in mind Xerox's heavy burden of proof, we conclude that the interest income was not exempt from taxation under the provisions of the statute.

## B.

Xerox subtracted the royalty and interest income from its Maryland net taxable income on the theory that the income should be separately accounted for and allocated entirely to a specific foreign taxing jurisdiction or jurisdictions.[2] Under § 316 (c), however, separate accounting is not permitted when a corporation is engaged in a unitary business.[3] Once

---

**2.** For a discussion of the various methods of state taxation of income from intangibles, *see* Dexter, *Taxation of Income from Intangibles of Multistate — Multinational Corporations,* 29 Vand. L. Rev. 401 (1976).

**3.** If a business is allowed to separately account for all or a portion of its "business income" under § 316 (c), then it may allocate that income in its entirety to a specific taxing jurisdiction or jurisdictions. No portion of a

Xerox conceded that it operated a unitary business within and without the State, it had the burden of proving by clear and cogent evidence that the interest and royalty income was unrelated to its unitary business operations. *See W. R. Grace & Co. v. Commissioner of Revenue,* 1979 Mass. Adv. Sh. 1927, 393 N.E.2d 330 (1979); *Commonwealth v. Emhart Corp.,* 443 Pa. 397, 278 A.2d 916, *appeal dismissed,* 404 U.S. 981, 92 S. Ct. 451, 30 L. Ed. 2d 364 (1971).

Numerous definitions of what constitutes a unitary business have been proposed. *See* Keesling & Warren, *The Unitary Concept In the Allocation of Income,* 12 Hastings L. J. 42 (1960); Rudolf, *State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Corporate Groups,* 25 Tax L. Rev. 171 (1970). In *Butler Bros. v. McColgan,* 17 Cal. 2d 664, 615, 111 P.2d 334, 341 (1941), *aff'd,* 315 U.S. 501, 62 S. Ct. 701, 86 L. Ed. 991 (1942), the Supreme Court of California focused on the presence of the following circumstances: "(1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation." Another commonly cited definition is whether one business enterprise is dependent upon or contributory to the other. G. Altman & F. Keesling, *Allocation of Income In State Taxation* 101 (2d ed. 1950). In *Great Lakes Pipe Line Co. v. Commissioner of Taxation,* 272 Minn. 403, 138 N.W.2d 612 (1965), *appeal dismissed,* 384 U.S. 718, 86 S. Ct. 1886, 16 L. Ed. 2d 881 (1966), the Supreme Court of Minnesota stated that

> "[W]hether a number of business operations having common ownership constitute a single or unitary business or several separate businesses for tax purposes depends upon whether they are of mutual benefit to one another and on whether each operation is dependent on or contributory to others." *Id.* at 408, 138 N.W.2d at 616.

---

corporation's income allocated in this manner would be taxed by Maryland, unless, of course, the income was allocated to this State.

In the present case, separate corporate entities are not involved. Xerox's copier operations and the activities that produced the royalty and interest income were conducted by a single corporation; there was unity of ownership and management. In addition, there is no suggestion that a separate corporate division, with its own officers, staff, payroll and accounting system, was in charge of the royalty and interest income-producing activities.

Xerox has attempted to meet its burden of proof by pointing to the following facts: (1) none of the licensing or loan agreements was entered into in Maryland; (2) none of the intangible assets giving rise to the royalty income was acquired or developed in Maryland, and documents evidencing ownership of these intangible assets were kept in Connecticut or New York; (3) the licensing and loan agreements were administered in Connecticut and New York. Xerox also suggests that because its copier operations generated working capital in an amount greater than its actual "general business needs" for such capital, the income in question was "not used to meet Xerox's working capital needs in its active operations." Finally, it is contended that the requisite economic interdependence among the relevant income-producing activities is lacking in this case.

In determining whether the copier operations and the activities that led to the receipt of the royalty and interest income were dependent on or contributory to each other, we must examine the nature of these business activities. Xerox's copier operations involved the manufacture, sale, rental and maintenance of copier equipment. The royalty income came from licensing agreements under which Xerox received fees for permitting the use of its trademarks, patents, copyrights and business know-how. A yearly average of approximately 90% of the royalty income was paid by foreign subsidiaries for the use of Xerox's name. Certainly, a portion of the market value of Xerox's name was attributable to active copier operations carried on in this State. Manifestly, at least some of the patents, copyrights and know-how were used in Xerox's domestic operations as well as being licensed to subsidiaries, affiliates, and

nonaffiliated corporations.[4] Xerox has not shown that the capital used to develop the intangible assets did not emanate, at least in part, from its copier operations, nor has it demonstrated that the royalty income was not considered a part of working capital. Finally, the intangibles have been characterized by Xerox as "assets," and therefore improved Xerox's ability to obtain any necessary loans to be used in connection with its copier business. *See generally, Household Finance v. Tax Comm.,* 212 Md. 80, 128 A.2d 640 (1957); *Commonwealth v. Emhart Corp., supra,* 443 Pa. at 404-405, 278 A.2d at 919.

The interest income was produced by substantial loans made to foreign subsidiaries. The record shows that Xerox's primary business, and in all probability primary source of income, was the manufacture, sale, rental and maintenance of copier equipment. It would appear, therefore, that at least a portion of the capital employed in making the loans, which totaled $77,669,226 in 1974, came from funds generated by Xerox's copier business. Moreover, loans were made when the foreign subsidiaries were unable to borrow in the regular commercial market. The continued vitality of the foreign subsidiaries was of obvious importance to Xerox, which had substantial stock interests in these corporations and received large royalty payments from them.

Although a more precise and properly focused record may have been desirable in this case, we conclude that Xerox has failed to meet its burden of proving that the royalty and interest income was produced by activities separate and distinct from the unitary business conducted in part in Maryland. *See W. R. Grace & Co. v. Commissioner of Revenue, supra; Great Lakes Pipe Line Co. v. Commissioner of Taxation, supra; Johns-Manville P. Corp. v. Commissioner of Rev. Adm.,* 115 N.H. 428, 343 A.2d 221 (1975), *appeal dismissed,* 423 U.S. 1069, 96 S. Ct. 851, 47 L. Ed. 2d 79 (1976); *F. W. Woolworth Co. v. Director of Div. of Taxation,*

---

4. For an extensive discussion of the history and operations of Xerox Corporation, *see* Van Dyk Research Corp. v. Xerox Corp., 478 F. Supp. 1268 (D.N.J. 1979), *aff'd,* 631 F.2d 251 (3d Cir. 1980).

45 N.J. 466, 213 A.2d 1 (1965); *Commonwealth v. Minnesota Mining & Mfg. Co.,* 402 Pa. 612, 168 A.2d 560 (1961); *Commonwealth v. Lucky Stores, Inc.,* 217 Va. 121, 225 S.E.2d 870 (1976). As such, apportionment rather than separate accounting was proper under § 316 (c).

### C.

Section 316 (c) provides for taxation of

"so much of the business income of the corporation as is derived from or reasonably attributable to the trade or business of the corporation carried on within this State . . . ."

Xerox argues that the phrases "derived from" and "reasonably attributable to" reveal that the Legislature, in enacting § 316 (c), intended to adopt a standard of taxation more restrictive than that required by the Supreme Court decisions concerning the due process and commerce clauses of the federal constitution. We find nothing in the case law or the legislative history of § 316 (c) that supports Xerox's position. We agree with the lower court's conclusion that § 316 (c) prescribes taxation of so much of a corporation's net income as is constitutionally permissible.

### IV

In challenging Maryland's authority to tax an apportioned amount of its interest and royalty income, Xerox relies on the due process and commerce clauses of the federal constitution. In *Mobil Oil Corp. v. Commissioner of Taxes, supra,* Mobil challenged on due process and commerce clause grounds Vermont's taxation of an apportioned amount of dividend income that it had received from foreign affiliates and subsidiaries. Mobil argued that the due process clause prohibited taxation of this "foreign source" dividend income because there was no "nexus" between Vermont and either the payor corporations or Mobil's management of the investments that produced the dividend income. The Supreme Court held that the due process clause imposes two require-

ments on state taxation of income earned in interstate commerce:

> "[A] 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise."

445 U.S. at 436-37, 100 S. Ct. at 1231.

The Court also ruled that:

> "The requisite 'nexus' is supplied if the corporation avails itself of the 'substantial privilege of carrying on business' within the State; and '[t]he fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction.' "

*Id.* at 437, 100 S. Ct. at 1231 (quoting from *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 444-45, 61 S. Ct. 246, 250, 85 L. Ed. 267 (1940)). In order to prevent Vermont's taxation of its dividend income, Mobil had the burden of proving that "the income was earned in the course of activities unrelated to the sale of petroleum products in that State." 445 U.S. at 439, 100 S. Ct. at 1232. Mobil failed to meet its burden of proof, and the Court, finding that the foreign payor corporations and Mobil were part of a unitary business, concluded that there was no due process bar to Vermont's taxation of the dividend income.

Xerox argues that this Court, as the Supreme Court did in *Mobil Oil,* should focus its due process inquiry on whether Xerox formed a unitary business with the payors of the royalty and interest income. The Supreme Court's focus in *Mobil Oil,* however, was necessitated by the fact that *dividend* income was involved. Because certain kinds of investment income, such as dividend income, might not have any connection with the activities conducted by a corporation in a given taxing State unless the taxpayer and the payor corporations formed a unitary business, the source of the income is relevant in resolving due process challenges to

state taxation. Indeed, the Supreme Court observed in *Mobil Oil* that:

> "We do not mean to suggest that all dividend income received by corporations operating in interstate commerce is necessarily taxable in each State where that corporation does business. Where the business activities of the *dividend* payor have nothing to do with the activities of the recipient in the taxing State, due process considerations might well preclude apportionability, because there would be no underlying unitary business."
>
> 445 U.S. at 441-42, 100 S. Ct. at 1233-34 (emphasis added).

Dividend income is not involved in the present case. The appropriate due process inquiry here centers around the relationship between the activities that produced the royalty and interest income and Xerox's business activities in Maryland rather than on the relationship between Xerox and the payor corporations. This was the approach taken by the Supreme Court in *Exxon Corp. v. Wisconsin Department of Revenue*, 447 U.S. 207, 100 S. Ct. 2109, 65 L. Ed. 2d 66 (1980), decided some three months after *Mobil Oil, supra.* Exxon, a vertically integrated petroleum corporation, argued that the separate functional accounting practiced for its marketing, exploration and production, and refining activities should have been respected by a State seeking to tax an apportioned amount of its total net income. The only activities conducted by Exxon in the taxing State were related to its marketing operations. The marketing operations were performed by a department that had its own management, was treated as a separate investment center, and competed with other departments for investment funds. Exxon's argument that Wisconsin could tax on apportioned amount of income derived from its marketing operations within and without the state, but could not reach any income derived from its refining or exploration and production activities, was rejected by the Court. After finding that the requisite due process nexus had been established, it said:

"In order to exclude certain income from the apportionment formula, the company must prove that 'the income was earned in the course of activities unrelated to the sale of petroleum products in that State.' ... The court looks to the 'underlying economic realities of a unitary business,' and the income must derive from 'unrelated business activity' which constitutes a 'discrete business enterprise.'"

*Id.* at 223-24, 100 S. Ct. at 2120 (citations omitted) (quoting from *Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 U.S. at 439, 441, 442, 439, 100 S. Ct. at 1232, 1233, 1234, 1232). Finding that Exxon was a unitary business, the Court held that Exxon had failed to meet its burden of proof.

The first of the two parts of the due process test — the existence of a "minimal connection" or "nexus" — concerns a State's jurisdiction to tax a business's income. The second part of the test — whether there is a rational relationship between the taxing State and the intrastate values of the taxpayer's enterprise — deals with constitutional limits on the application of a particular apportionment formula. Xerox does not dispute that it availed itself of the substantial privilege of doing business in Maryland. Xerox maintained serveral offices in this State, and its representatives sold, rented and maintained copier equipment in Maryland. The total volume of business done by Xerox in Maryland is not revealed by the record, but the nexus between Xerox and this State was clearly sufficient for imposition of an income tax. The existence of the requisite nexus means that Xerox, in order to exclude the interest and royalty income from taxation in this State, must prove that the income was derived from unrelated business activity that constituted a discrete business enterprise. *Exxon Corp. v. Wisconsin Department of Revenue, supra,* 447 U.S. at 224, 100 S. Ct. at 2120; *Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 U.S. at 439, 100 S. Ct. at 1232. We have already held that Xerox's copier activities and the activities that produced the royalty and interest income were part of a unitary

business enterprise. Xerox therefore failed to meet its burden of proof.[5]

## B.

Xerox argues that even if the royalty and interest income was subject to apportionment, certain modifications of the standard three-factor formula used by the Comptroller were constitutionally required. While modification of the three-factor formula is within the Comptroller's discretion under § 316 (c),[6] we cannot agree that modification was

---

**5.** There is no merit in Xerox's suggestion that a 1938 Supreme Court decision, Connecticut General Life Ins. Co. v. Johnson, 303 U.S. 77, 58 S. Ct. 436, 82 L. Ed. 673, controls the question whether Maryland's taxation of its royalty and interest income violated due process. In that case, California had taxed a fixed percentage of premiums received by Connecticut General on reinsurance policies issued to insurance companies doing business in California. Although Connecticut General was licensed to and did conduct insurance business in California, the reinsurance aspect of its business was distinguished from its other insurance activities because the reinsurance contracts were all entered into and administered in Connecticut, the premiums were paid in Connecticut, and all claims were paid from that state. The Court concluded that under the Fourteenth Amendment California lacked jurisdiction to tax the reinsurance premiums:

"All that appellant did in effecting the reinsurance was done without the state and for its transaction no privilege or license by California was needful. The tax cannot be sustained either as laid on property, business done, or transactions carried on within the state, or as a tax on a privilege granted by the state." *Id.* at 82, 58 S. Ct. at 439.

The result in *Connecticut General* is not necessarily inconsistent with the general approach to state taxation of multistate businesses taken by the Supreme Court in the later *Mobil Oil* and *Exxon* cases. Connecticut General apparently did avail itself of the substantial privilege of doing insurance business in California. Under both *Mobil Oil* and *Exxon,* therefore, California would have had the power to tax the reinsurance premiums unless Connecticut General could prove that the income was earned in the course of activities unrelated to the insurance business it conducted in California. *See Exxon Corp., supra,* 447 U.S. at 224, 100 S. Ct. at 2120. *Connecticut General* can be read, in effect, simply as a ruling that the company had met its burden of proving that its reinsurance activities were separate and distinct from the insurance business it conducted in California. *Connecticut General,* however, is not so factually similar to the present case as to alter the conclusion that Xerox failed to meet the burden of proof described in *Mobil Oil* and *Exxon.* Whatever the continued vitality of *Connecticut General* may be, *see* Wisconsin v. J. C. Penney Co., *supra,* 311 U.S. at 445-46, 61 S. Ct. at 250, it does not control the outcome of this case.

**6.** Section 316 (c) provides:

"The Comptroller of the Treasury shall have the right, in those cases where circumstances warrant, to alter any of the above rules

required. Once the first part of the due process test has been satisfied, the taxpayer must prove that there is no rational relationship between the portion of its income attributed to the State through application of an apportionment formula and the value of the business it conducted within the taxing State. *Exxon Corp. v. Wisconsin Department of Revenue,* 447 U.S. at 219-20, 100 S. Ct. at 2118; *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. at 437, 100 S. Ct. at 1231. In *Moorman Manufacturing Co. v. Bair,* 437 U.S. 267, 274, 98 S. Ct. 2340, 2345, 57 L. Ed. 2d 197 (1978), the Supreme Court reaffirmed the basic principles that

> "[T]he States have wide latitude in the selection of apportionment formulas and ... a formula-produced assessment will only be disturbed when the taxpayer has proved by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of the appropriate proportions to the business transacted ... in that State,' ... or has 'led to a grossly distorted result.'"

(Citations omitted) (quoting from *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell,* 283 U.S. 123, 135, 51 S. Ct. 385, 389, 75 L. Ed. 879 (1931) and *Norfolk & Western R. Co. v. State Tax Comm'n,* 390 U.S. 317, 326, 88 S. Ct. 995, 1002, 19 L. Ed. 2d 1201 (1968)). Xerox has produced no evidence regarding the value of the business it transacted within the State. We cannot say, therefore, that the factors of 2.160, 2.028, and 1.905, which were used to apportion Xerox's net income to this State for the tax years 1972, 1973, and 1974, respectively, led to a "grossly distorted result" or that the assessments were "all out of appropriate proportion" to the business Xerox transacted in this State.

---

as to the use of the separate accounting method or the formula method, the weight to be given the various factors in the formula, the manner of valuation of rented property included in the property factor and the determination of the extent to which tangible personal property is permanently located within the State."

## C.

A commerce clause challenge to state taxation of income earned by a business in interstate commerce is to be evaluated by examining:

> "[T]he practical effect of a challenged tax to determine whether it 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' "

*Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 U.S. at 443, 100 S. Ct. at 1234 (quoting from *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S. Ct. 1076, 1079, 51 L. Ed. 2d 326 (1977)). Xerox has alleged that Maryland taxation of the royalty and interest income violated the commerce clause. However, it has not articulated a commerce clause argument separate and distinct from its due process argument. Presumably, it is the "nexus with the taxing State" that Xerox believes is lacking in this case. We have already held, however, that a sufficient nexus was present for purposes of the due process clause, and no reasons appear to require a different result under the commerce clause.

As Maryland taxation of Xerox's royalty and interest income was proper under the relevant statutory and constitutional standards, the Comptroller's assessment of the additional tax liability was not in error.

> *Judgment affirmed; costs to be paid by appellant.*