716 A.2d 276

**HERCULES INCORPORATED**

**v.**

**COMPTROLLER of the TREASURY.**

**No. 122, Sept. Term, 1997.**

Court of Appeals of Maryland.

Sept. 1, 1998.

Stuart Levine (Eric M. Newman, on brief), Baltimore, Paul H. Frankel (Morrison & Foerster, L.L.P., on brief), New York City, for petitioner.

Gerald Langbaum, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; John K. Barry, Asst. Atty. Gen., on brief), Annapolis, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

The question in this case is whether the Due Process Clause of the Constitution of the United States permits Maryland to

tax a portion of a capital gain that the petitioner, Hercules Incorporated (Hercules), realized in 1987 on the sale of its 37.5% stock interest in HIMONT Incorporated (HIMONT), a corporation created in 1983 when Hercules restructured part of its business. The Maryland Tax Court, the Circuit Court for Baltimore City, and the Court of Special Appeals in *Hercules, Inc. v. Comptroller of the Treasury,* 117 Md.App. 29, 699 A.2d 461 (1997), all answered the question in the affirmative. We reverse for the reasons stated below.

Hercules is a Delaware corporation with its principal place of business in Wilmington, Delaware. As it describes itself in its 1987 annual report, Hercules "is a worldwide supplier of a broad line of natural and synthetic materials and products and related systems," serving, *inter alia,* "the electronics, packaging, aerospace, food, synthetic fibers, automotive, graphic arts, adhesives, paper coatings, and personal-care industries." Hercules's principal business activity in Maryland during the relevant time period was the sale of industrial chemicals.

Prior to 1983 one aspect of Hercules's business was the manufacturing of polypropylene resin (PPL) from propylene, a petrochemical. Hercules used 10% to 15% of its PPL production in the manufacture of film and fibers, and it sold the balance of its PPL production on the open market. Hercules failed to keep pace with the technology in the field so that its PPL production was not as efficient and profitable as that of the more technically advanced producers.

Accordingly, as early as 1978, Hercules decided to divest itself of its PPL manufacturing business, but it had not found a purchaser by 1983. In 1983 Hercules and Montedison S.p.A. (Montedison), an Italian manufacturer that utilized state of the art technology, formed a joint venture. Each company contributed its PPL manufacturing assets, Hercules contributed its North American marketing organization, and, apparently, Montedison contributed its European marketing organization. The PPL manufacturing plants owned by Hercules were in Louisiana and Texas. As the transferee of these assets the joint venturers created HIMONT, a Delaware corporation.

Pursuant to their joint venture, Hercules and Montedison each owned 50% of HIMONT's stock. At start-up on November 1, 1983, HIMONT issued a promissory note to Hercules in the amount of $70 million, payable over five years at commercially competitive interest rates. This obligation was designed to offset the amount by which Hercules's initial capital contribution to the formation of HIMONT exceeded Montedison's.

By means of the formation of HIMONT the joint venturers completely divested themselves of their PPL manufacturing business, but Hercules continued to use PPL to manufacture film and fibers. Hercules (and Montedison) entered into a requirements contract with HIMONT under which HIMONT agreed to sell PPL to the parents of the venture at the open market price less a 2.5% "discount intended to recognize the fact that selling and other indirect expenses will be less for sales to the parents of the venture than that incurred in the open marketplace." Hercules purchased between $117 and $146 million worth of PPL per year from HIMONT from 1984 to 1987. These purchases amounted to between 12% and 13% of HIMONT's annual sales over this time. At oral argument counsel for Hercules represented to this Court that Hercules's purchases of PPL from HIMONT were "somewhere in the eighty percent range" of Hercules's requirements.

At the time of the initial formation of HIMONT, Hercules and Montedison were each entitled to appoint three directors to HIMONT's six-member board of directors. Other than the three individuals who were so appointed by Hercules and who served only as directors in HIMONT, there were no common officers or employees of Hercules and HIMONT.

When HIMONT was first created, it contracted for certain administrative services from Hercules and Montedison because HIMONT needed time to hire, train, and staff a complete administrative structure. These administrative services were accounting, contracting, payroll, finance, and insurance. HIMONT decided what services it needed and made the policy decisions. Hercules and Montedison then supplied the manpower on a subcontracting basis to implement those deci-

sions. As time went on, the services provided to HIMONT by Hercules declined as HIMONT built up its administrative structure.

In February 1987 HIMONT was taken public. The initial offering price for HIMONT stock was $28 per share. This offering raised over $379 million and diluted Hercules's and Montedison's ownership of HIMONT from 50% each to 37.5% each, while the public held 25%. After the public offering HIMONT's board of directors was expanded to nine members. Hercules had the right to appoint three of the nine directors.

In September 1987 Hercules sold all of its stock in HIMONT to Montedison at $59.50 per share, realizing a $1.3 billion gain from a total net proceeds of nearly $1.5 billion. The sale was precipitated, at least in part, by Montedison's threat to make a hostile tender offer to the shareholders of Hercules. Hercules listed this capital gain on its 1987 Maryland Corporation Income Tax Return, and, after computing a statutory apportionment factor of .001434, paid $137,307 in Maryland state income taxes.

In 1991 Hercules filed an amended 1987 Maryland Corporation Income Tax Return, in which it excluded the $1.3 billion gain in computing the apportionment to Maryland. Hercules requested a tax refund of $132,562. In October 1992 this claim was denied by the respondent, Comptroller of the Treasury (the Comptroller).

Hercules appealed this denial of refund to the Maryland Tax Court. The hearing record before that agency consists of a stipulation of facts, certain documents, and the testimony of a former officer of Hercules. On January 3, 1995, the Tax Court affirmed the decision of the Comptroller, holding that there was "insufficient convincing evidence that the gain on the sale of Himont stock was the result of a discrete business enterprise unrelated to Hercules' unitary activities." Hercules moved the Tax Court to withdraw its opinion in order to permit a motion for reconsideration; the Tax Court, by an order entered January 27, 1995, withdrew its order of January 3. After considering and denying Hercules's motion for recon-

sideration, the Tax Court, by an order entered March 16, 1995, reinstated its original order upholding the decision of the Comptroller.

The Tax Court viewed the primary question to be whether the ownership and sale by Hercules of its stock in HIMONT was for "operational purposes." That agency focused on two aspects of the Hercules–HIMONT relationship, (1) the consummation, by the sale of HIMONT stock, of Hercules's "long-term corporate strategy for '... profitable disengagement from the [PPL] business'"[1] and (2) the requirements contract. The agency concluded that

"Hercules sought to disengage from the [PPL] manufacturing business in order to avoid unreliable markets for the purchase of raw materials, and to shift its corporate focus to that of a specialty chemical company. In the creation, nourishment, operation and sale of Himont, there was a significant flow of value both from Hercules to Himont and back from Himont to Hercules."

Hercules petitioned the Circuit Court for Baltimore City for judicial review. That court affirmed the agency decision. Hercules appealed to the Court of Special Appeals. That court affirmed, reasoning that "the function of the creation of HIMONT and ultimate sale of HIMONT stock was not merely

---

1. The 1987 annual report of Hercules, quoted in full by the Tax Court, describes the transaction as follows:

" 'The sale of Himont represents Hercules' substantial and highly profitable disengagement from the [PPL] business. From the early eighties, Hercules' primary objective for [PPL] was the enhancement of its value, for ultimate disposition. The formation of the Himont joint venture during 1983 brought technical and marketing advantages to the business and the final step of taking Himont public (in February of 1987) allowed the markets to value our accomplishments, paving the way for a negotiated sale of our remaining interest. Hercules' efforts over the years in disposing of this major element of the company (which no longer fits into strategic plans) paid dividends in terms of profit and financial resources. The financial resources provided will enhance expansion into value-added, growth-oriented areas of the chemical industry. These are businesses in which the company has greater influence over its destiny because they are based on technology rather than raw material position.' "

to increase the investor's profitability in the usual sense of the term, but instead, was to transform the nature of the investor's business." *Hercules,* 117 Md.App. at 54, 699 A.2d at 473. Accordingly, it was held that the Tax Court properly determined that Hercules's investment in HIMONT fell on the operational side of the line between an investment and an operational function. *Id.*

This Court granted Hercules's petition for a writ of certiorari as well as the Comptroller's conditional cross-petition which questions the timeliness of Hercules's petition to the circuit court for judicial review.

Additional facts will be presented, as necessary, in the resolution of these issues.

I

The Comptroller contends that Hercules failed to comply with Maryland Rule 7–203(a)(1), which requires that a party file for judicial review within thirty days of the date of the order of an administrative agency from which review is sought. The Tax Court issued its first order on January 3, 1995. That order was withdrawn on January 27, 1995. The Tax Court reinstated its original order on March 16, 1995. Hercules petitioned for judicial review on March 24, 1995.

The Comptroller argues by analogy to *Hess v. Chalmers,* 27 Md.App. 284, 339 A.2d 706, *cert. denied,* 276 Md. 744 (1975), a declaratory judgment case in which the operation of an order was stayed and then the stay was lifted. In *Hess,* the days elapsed prior to the stay were added to the days after the suspension was vacated in computing the time limit. "The countdown was resumed, not to start again from the beginning, but to take up where it left off." *Id.* at 288, 339 A.2d at 708. The Comptroller argues that twenty-three days had elapsed prior to the Tax Court's withdrawal of its January 3 order, and that the clock therefore started at twenty-four after the filing of the March 16 order. This would make Hercules's petition for review untimely by two days.

The Comptroller's argument, however, conflates the meaning of "stay" and "withdraw." Prior to the expiration of the time for petitioning for judicial review, an administrative body has the power to strike its own order, which is what occurred here. Consequently, the March 16 order was the final order in the proceeding. Indeed, by means of a stamped legend the Clerk of the Maryland Tax Court gave notice that the parties had the right to "appeal" within thirty days "from the date of the above Order."

We now turn to the merits.

## II

■ "Under both the Due Process and the Commerce Clauses of the Constitution, a State may not, when imposing an income-based tax, 'tax value earned outside its borders.'" *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 164, 103 S.Ct. 2933, 2939, 77 L.Ed.2d 545, 552 (1983) (quoting *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982)).

Hercules's sales within Maryland during the critical time period—the 1987 tax year—were seven-tenths of 1% of its total sales. The taxpayer had sales of $14.1 million in Maryland, as compared to $2 billion overall. It owned $32,155 worth of machinery and equipment within the state and paid $82,820 in Maryland salaries; overall, Hercules owned $2.8 billion in assets and paid over $627 million in salaries and wages. Uncontradicted testimony established that Hercules had no manufacturing facilities in Maryland and that the salaries paid in this state reflected individuals who lived in Maryland but commuted to Hercules's home office in Wilmington, Delaware.

■ In order to levy a tax upon Hercules's capital gain from the sale of HIMONT stock, there must be some nexus linking this income to activities within the state. The necessary nexus usually "is satisfied by demonstrating the existence of unitary business, part of which is carried on in the taxing state." *NCR Corp. v. Comptroller of the Treasury, Income*

*Tax Div.,* 313 Md. 118, 132, 544 A.2d 764, 771 (1988). Where the nexus exists, the Maryland tax on a corporation engaged in a multi-state business is governed by Maryland Code (1957, 1997 Repl.Vol.), § 10–402(c) of the Tax–General Article (TG), which requires that net income be apportioned to this state on the basis of a formula using property, payroll, and sales. *See Random House, Inc. v. Comptroller of the Treasury,* 310 Md. 696, 697, 701, 531 A.2d 683, 683, 685 (1987); *see also NCR Corp.,* 313 Md. 118, 141–42, 544 A.2d 764, 775; *Xerox Corp. v. Comptroller of the Treasury, Income Tax Div.,* 290 Md. 126, 129–30, 428 A.2d 1208, 1211 (1981); *accord Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). The legislative purpose underlying this statute is to tax multi-state corporations doing business in Maryland to the bounds permitted by the United States Constitution. *NCR Corp.,* 313 Md. at 146, 544 A.2d at 777. To that end, the question before us becomes one of federal constitutional, rather than of Maryland statutory, law. In resolving that question, the burden is on the taxpayer to show " 'by "clear and cogent evidence" that [the state tax] results in extraterritorial values being taxed.' " *Container Corp.,* 463 U.S. at 175, 103 S.Ct. at 2945, 77 L.Ed.2d at 559–60.

Hercules submits that the undisputed facts in this case meet that burden because the claimed connection to Maryland is too remote. In addition to its analysis of decisions of the Supreme Court of the United States, Hercules relies on *Hercules Inc. v. Commissioner of Revenue,* 575 N.W.2d 111 (Minn. 1998), where the Supreme Court of Minnesota held, *inter alia,* that that state could not constitutionally tax an apportioned part of the gain realized by Hercules on the very sale of stock that gives rise to Maryland's attempt to tax an apportioned part of the same gain.[2] The Comptroller argues (1) that "Hercules' creation and ownership of, relationship with, and ultimate sale of HIMONT served an operational function of

---

2. The decision of the Supreme Court of Minnesota was rendered on March 12, 1998, well after the decision by the Court of Special Appeals in the instant matter.

Hercules" such as to constitute a portion of its unitary business and (2) that "the presence of a flow of value between Hercules and HIMONT establishes that they comprised a unitary business."

### Creation and Ownership

The Supreme Court has recently reemphasized its three-part test in determining whether a subsidiary is a part of the unitary business of the parent; those three elements are: (1) functional integration, (2) centralization of management, and (3) economies of scale. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. 768, 783, 112 S.Ct. 2251, 2260, 119 L.Ed.2d 533, 549 (1992). Looking to the period prior to HIMONT's going public, and not to the year of the stock sale, the Comptroller submits the following argument, the relevance of which is questionable:

"Hercules, as a 50% shareholder, controlled, in concert with Montedison, all aspects of HIMONT. Indeed, HIMONT's by-laws expressly gave Hercules (and Montedison) veto power over such major corporate acts as adoption of budgets, adoption of long-range plans and objectives, disposal of large capital assets, and declaration of dividends."

The Supreme Court considered and rejected precisely this sort of argument in *F.W. Woolworth Co. v. Taxation & Revenue Dep't,* 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982). In *F.W. Woolworth,* the parent company owned all of the stock of three of the four foreign subsidiaries at issue, as well as a 52.7% interest in the fourth—a far greater level of ownership than that of Hercules in HIMONT in 1987. F.W. Woolworth elected all of the three wholly-owned subsidiaries' directors, and had the "authority to operate these companies as integrated divisions of a single unitary business." *Id.* at 362, 102 S.Ct. at 3134, 73 L.Ed.2d at 826. Moreover, the record demonstrated "some managerial links" between F.W. Woolworth and its subsidiaries; there were common directors with the parent company and frequent communications between the subsidiaries and the parent. *Id.* at 368, 102 S.Ct. at 3137, 73 L.Ed.2d at 830.

Nevertheless, the Supreme Court reiterated that the proper test under the Constitution was not the *potential* of unitary control, but rather the actual, in fact unitariness or separateness of the subsidiary enterprises. *Id.* at 362, 102 S.Ct. at 3134, 73 L.Ed.2d at 826. *See also ASARCO,* 458 U.S. at 320–22, 102 S.Ct. at 3111–12, 73 L.Ed.2d at 798–99 (no unitary control where the parent owned 51.5% of the stock of the subsidiary and could have controlled the subsidiary's management). Thus, the Supreme Court found little functional integration between F.W. Woolworth's subsidiaries and the parent company. *F.W. Woolworth,* 458 U.S. at 364, 102 S.Ct. at 3135, 73 L.Ed.2d at 828. The subsidiaries performed their functions " 'autonomously and independently of the parent company.' " *Id.* at 365, 102 S.Ct. at 3135, 73 L.Ed.2d at 828 (quoting undisputed trial testimony). Thus, there was insufficient functional integration to consider the dividends from the four subsidiaries as part of F.W. Woolworth's unitary business. *Id.* at 366, 102 S.Ct. at 3136, 73 L.Ed.2d at 829.

■ Similarly, the day-to-day operation of HIMONT was relatively autonomous of Hercules. HIMONT had its own research, sales, marketing, and manufacturing personnel. HIMONT employees who were hired away from Hercules were terminated by Hercules and informed that they would have no "bridge" back to the parent company. No employee or officer of HIMONT was simultaneously an employee or officer of Hercules. At the time of the sale of HIMONT stock, only three members of HIMONT's nine-person board of directors were appointed by Hercules.

■ The Comptroller also makes reference to the fact that HIMONT was created by agreement between Hercules and Montedison, as opposed to having been acquired on the open market. This is the proverbial distinction which lacks a difference. Maryland may not tax income earned outside its borders, even on a proportional basis, unless there is " ' "a rational relationship between the income attributed to the State and the intrastate values of the enterprise." ' " *Container Corp.,* 463 U.S. at 166, 103 S.Ct. at 2940, 77 L.Ed.2d at

553 (quoting *Exxon Corp. v. Wisconsin Dep't of Revenue,* 447 U.S. 207, 219–20, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66, 79 (1980), in turn quoting *Mobil Oil Corp.,* 445 U.S. at 437, 100 S.Ct. at 1231, 63 L.Ed.2d at 520). The manner by which HIMONT was created in no way illuminates the Hercules–HIMONT relationship four years later.

The principal basis of decision by the Tax Court viewed the entire purpose of HIMONT's existence to be extricating Hercules from the PPL manufacturing business, and that, as such, the sale of stock should be considered an operational part of Hercules's business.[3] This Tax Court analysis, approved by the Court of Special Appeals, would stretch functional integration beyond the constitutional bounds established by the Supreme Court which, in analogous cases, has not encompassed strategic, long-range decisions of a company within operational functions.

In *ASARCO,* the Supreme Court flatly rejected the argument that "corporate *purpose* should define unitary business." *ASARCO,* 458 U.S. at 326, 102 S.Ct. at 3114, 73 L.Ed.2d at 801. In that case, Idaho contended that the dividends paid on stock held by ASARCO in partial subsidiaries should be considered a part of that company's unitary business if the investments were " 'acquired, managed *or disposed of* for purposes relating or contributing to the taxpayer's business.' " *Id.* (quoting Idaho's brief) (emphasis added). The Supreme Court rejected this argument, stating that such a broad definition of unitary business "would destroy the concept." *Id.*

Guidance on the constitutional issue is also found in *Allied–Signal,* 504 U.S. 768, 112 S.Ct. 2251, 119 L.Ed.2d 533. The case concerned New Jersey's attempt to tax an apportioned part of the gain realized by Bendix on its sale of 20.6% of the

---

3. The Comptroller's brief in this Court states that "had [Hercules] sold its [PPL] manufacturing business outright, without the intervening step of a tax fee exchange creating HIMONT, the gain on such a sale would have produced apportionable taxable income." Brief of Respondent at 22. This proposition is true, but irrelevant. At oral argument in this Court, the Comptroller disclaimed relying on the theory of a step transaction.

stock of ASARCO Inc. that Bendix had purchased on the open market over a period of two years. Bendix had four major operating groups: automotive, aerospace/electronics, industrial/energy, and forest products. ASARCO was a world leader in producing nonferrous metals. The Court recognized that "the payee and the payor need not be engaged in the same unitary business as a prerequisite to apportionment in all cases." *Id.* at 787, 112 S.Ct. at 2263, 119 L.Ed.2d at 552. "What is required instead is that the capital transaction serve an operational rather than an investment function." *Id.* New Jersey argued that Bendix's sale of the ASARCO stock served an operational function because Bendix intended to use the proceeds from the sale to acquire another aerospace company, Martin Marietta. *Id.* at 789, 112 S.Ct. at 2264, 119 L.Ed.2d at 553. The Supreme Court rejected this argument, pointing out that it "reveal[ed] little about whether ASARCO was run as part of Bendix's unitary business." *Id.* Of course, when Bendix sought to acquire Martin Marietta, it also withdrew its investment in a partial subsidiary engaged in the smelting and refining business. Seemingly the strategic decision to discontinue an investment in one area of activity in order to concentrate resources elsewhere is no more an operating function in the case before us than was the strategic decision in *Allied–Signal.*

To illustrate further why Bendix's investment in ASARCO was not an operating function, the Court in *Allied–Signal* stated that the ASARCO stock was not a "short-term investment of working capital analogous to a bank account or certificate of deposit." *Id.* at 789–90, 112 S.Ct. at 2264, 119 L.Ed.2d at 553–54. Similarly, in the decision on the sale by Hercules of its stock in HIMONT, the Supreme Court of Minnesota rejected the argument that the sale served an operational function for Hercules by pointing out that Hercules had not "treated its investment in Himont as a repository for working capital like a bank account or certificate of deposit." *Hercules,* 575 N.W.2d at 117.

The Supreme Court has made clear beyond any doubt that the proper level of inquiry under the Constitution depends

upon the actual connection between the subsidiary investment and its parent. How the parent intends to use the income derived from its investments is irrelevant. "Income, from whatever source, always is a 'business advantage' to a corporation. Our cases demand more. In particular, they specify that the proper inquiry looks to 'the underlying unity or diversity of business enterprise....'" *F.W. Woolworth,* 458 U.S. at 363, 102 S.Ct. at 3135, 73 L.Ed.2d at 827 (quoting *Mobil Oil Corp.,* 445 U.S. at 440, 100 S.Ct. at 1233, 63 L.Ed.2d at 523). This underlying unity is not present between Hercules and HIMONT.

### Flow of Value

■ The Comptroller also argues that HIMONT served as a source of "an essential product" for use in Hercules's unitary business operations. At HIMONT's formation, both Hercules and Montedison pledged good faith efforts to purchase all of their respective PPL requirements from HIMONT. The Comptroller thus analogizes the present situation to that of the taxpayer in *Corn Products Refining Co. v. Commissioner of Internal Revenue,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

In *Corn Products,* the Supreme Court held that a taxpayer's investment in corn futures constituted an integral part of the corporation's unitary business. In particular, the Court noted that the corporation had suffered through periods during which the raw materials necessary for their products were in short supply. In order to guard against future shortages, the taxpayer had invested in corn futures; later, the taxpayer sought to have the profit on those transactions classified as capital, rather than operating, gains. *Id.* at 48–49, 76 S.Ct. at 22–23, 100 L.Ed. at 33–34. The Supreme Court reasoned, *inter alia,* that such a speculative hedge on raw materials must be considered as part of the taxpayer's unitary business, for "[t]o hold otherwise would permit those engaged in hedging transactions to transmute ordinary income into capital gain at will." *Id.* at 52–54, 76 S.Ct. at 24–25, 100 L.Ed. at 35–36.

The instant case is far from analogous to *Corn Products*. On October 31, 1983, Hercules and Montedison, as the shareholders of HIMONT, drafted a document (the Sales Protocol) which set forth various principles governing the sale of PPL by HIMONT to a third party. The Sales Protocol provides:

"The basic principle for sale of [HIMONT] products to either [Hercules or Montedison PPL] consuming units shall be that the transfer will take place at market price, less a discount intended to recognize the fact that selling and other indirect expenses will be less for sales to the parents of the venture than that incurred in the open marketplace."

The Comptroller's interpretation of the Sales Protocol is that it "assure[d] a supply of inventory" to Hercules "at a favorable price." Moreover, the Comptroller characterizes the Sales Protocol as a sort of "sweetheart" deal, in which Hercules's favorable price was achieved solely by virtue of its relationship to HIMONT.

However, the Sales Protocol *on its face* belies any such contention. The rationale underlying the discount is specified as a volume discount in which the unit price is lower due to fewer transaction costs. The undisputed testimony is that PPL was widely available in the world market during this time. The Hercules witness, a retired Vice–President and General Counsel, testified that he was "very confident" that Hercules could have purchased PPL under the same terms and conditions from any third-party supplier during this time period given the volume Hercules was purchasing.

"[W]e could have entered into this kind of a supply contract with any of the other producers out there. Because there's never been a real shortage of [PPL]. And we were a big big customer, user of [PPL] in our fiber and film operation. Any manufacturer of [PPL] would have been delighted to have gotten our business."

Unlike *Corn Products*, there is no evidence here that Hercules has ever suffered through a period during which PPL was unavailable or even scarce.

Moreover, the relationship between Montedison, Hercules, and HIMONT also belies any inference that the Sales Protocol was anything but what it purported to be. In 1987, due to the public offering, Hercules's interest in HIMONT was reduced to a minority interest. At this time, Hercules *increased* its PPL purchases from HIMONT by nearly $25 million. Moreover, Hercules continued to purchase PPL from HIMONT at roughly the same rate after it divested itself of its ownership interest in HIMONT as it had prior to divestiture. Indeed, the Tax Court characterized the dealings between Hercules and HIMONT as "arm's-length agreements."

Thus, as the Supreme Court of Minnesota concluded, in analyzing the Sales Protocol:

"[PPL] was widely available on the world market during the 1980s, and Hercules purchased it from suppliers other than Himont soon after the agreement was signed. Further, Hercules purchased [PPL] from Himont at an arm's length price, and continued to buy [PPL] from Himont at the same price even after it sold the stock. Any argument that Himont sold [PPL] at a uniquely favorable price, solely based on its link to Hercules, is inconsistent with the record before us."

*Hercules,* 575 N.W.2d at 117.

There was no substantial evidence to support a finding that Hercules was using HIMONT as a "hedge" against future shortages of a valuable raw material or purchasing the materials at a below-market price. Therefore, the *Corn Products* doctrine is inapposite.

As further evidence of "a significant flow of value" from HIMONT to Hercules, the Comptroller points to the "administrative services provided by Hercules during the period of Hercules' ownership and thereafter." In this respect the Comptroller relies on *Container Corp.,* 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545, in which the Court upheld California's decision to tax income flowing to a corporation from its twenty foreign subsidiaries. Specifically, that decision held that the flow of value from the parent to the subsidiaries was signifi-

cant based on the following factors used by the California Court of Appeal:

> "These [factors] included appellant's assistance to its subsidiaries in obtaining used and new equipment and in filling personnel needs that could not be met locally, the substantial role played by appellant in loaning funds to the subsidiaries and guaranteeing loans provided by others, the 'considerable interplay between appellant and its foreign subsidiaries in the area of corporate expansion,' the 'substantial' technical assistance provided by appellant to the subsidiaries, and the supervisory role played by appellant's officers in providing general guidance to the subsidiaries."

*Id.* at 179, 103 S.Ct. at 2947, 77 L.Ed.2d at 562 (citations omitted). Elaborating on the degree to which the parent exercised control, supervision, and guidance, the Supreme Court noted:

> "Two of the factors relied on by the state court deserve particular mention. The first of these is the flow of capital resources from appellant to its subsidiaries through loans and loan guarantees. *There is no indication that any of these capital transactions were conducted at arm's-length, and the resulting flow of value is obvious.* ...
>
> "The second noteworthy factor is the managerial role played by appellant in its subsidiaries' affairs. ... In this case, the business 'guidelines' established by appellant for its subsidiaries, the 'consensus' process by which appellant's management was involved in the subsidiaries' business decisions, and the sometimes uncompensated technical assistance provided by appellant, all point to precisely the sort of operational role we found lacking in *F.W. Woolworth.*"

*Id.* at 180 n. 19, 103 S.Ct. at 2948 n. 19, 77 L.Ed.2d at 562 n. 19 (citations omitted; emphasis added).

On the facts of the instant matter there is no substantial difference between the service agreements and the requirements contract. The Tax Court found that the agreements were "arm's-length." Just as HIMONT was not selling PPL to Hercules at a discount that was not available to other

volume purchasers, HIMONT was not paying a premium to Hercules for the administrative services, and Hercules was not rendering the services at less than fair value. In this respect we agree with the analysis by the Supreme Court of Minnesota which said:

"Similarly, Hercules provided a broad spectrum of administrative services to Himont, including personnel, facilities, equipment systems, and equipment management, but these services were comparable to those available from many firms that provided corporate out-sourcing services. Importantly, Hercules provided these services at arm's length prices, and Himont continued to purchase them even after Hercules had sold its interest in Himont. The arm's length nature of these transactions indicates that they did not embody the requisite flow of value to create a unitary business relationship."

*Hercules,* 575 N.W.2d at 116.

For all of the foregoing reasons, we hold that Hercules's gain on the 1987 sale of its stock in HIMONT to Montedison is not subject to apportionment to Maryland for income taxation.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THIS ACTION TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE MARYLAND TAX COURT AND TO REMAND THIS ACTION TO THE MARYLAND TAX COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, COMPTROLLER OF THE TREASURY.**