*Comptroller of the Treasury v. Jason Pharmaceuticals, Inc.*, Case No. 1952, September Term, 2016, filed February 27, 2018.

## HEADNOTE

## TAX -- INTEREST ON TAX REFUND CLAIM -- ERROR "ATTRIBUTABLE TO THE STATE"

Where the erroneous overpayment was completely within the knowledge and control of the taxpayer, and no law, regulation, or policy of the State led to the taxpayer's error, the Comptroller may not pay interest in addition to the refund.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1952

September Term, 2016

_____

COMPTROLLER OF THE TREASURY,

v.

JASON PHARMACEUTICALS, INC.

_____

Nazarian,
Arthur,
Zarnoch, Robert A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Zarnoch, J.

_____

Filed:  March 1, 2018

This appeal arises from a decision of the Tax Court requiring the Comptroller to pay interest on two refunds of sales taxes for which the taxpayer was exempt under Maryland law. The Comptroller petitioned the Circuit Court for Anne Arundel County for review of the Tax Court's decision, and the circuit court upheld the Tax Court. The issue before us is whether there was substantial evidence in the record before the tax court to support its conclusion that the taxpayer's error in paying the tax was "attributable to the State," and therefore, that the Comptroller was required to pay interest on the refund claim.

### BACKGROUND AND PROCEDURAL HISTORY

Jason Pharmaceuticals, Inc. ("JPI") is a Maryland corporation, with its headquarters in Owings Mills, in Baltimore County. It is a subsidiary of Medifast, which is a weight-loss and weight-management program. JPI sells and distributes weight-management and other health-related products, and it prints paper materials and sells them to customers at Medifast's weight-loss centers. JPI operates a printing shop on Maryland's Eastern Shore, where it leases four large printing machines from Xerox Corporation ("Xerox"). JPI paid sales tax with each lease payment to Xerox from November 2007 through January 2013.

In August 2011, JPI and Medifast hired Gabriel Massuda ("Massuda") as its Tax Director. Massuda observed the printers at the Eastern Shore printing facility soon after, and he began looking into whether the printers could meet the criteria for a sales tax exemption on personal property used in manufacturing.

On May 10, 2012, after Massuda determined that JPI's printing activities might meet the exemption, he filed a refund claim with the Comptroller's Office, seeking a refund of $332,365 in sales tax overpayments for the preceding four years -- from 2008 to April

10, 2012. Even after JPI filed its first refund claim, however, it continued to pay sales tax to Xerox, because Massuda had not been able to confirm whether JPI's production activities met the threshold set by the statute to qualify for an exemption. Thereafter, on September 4, 2012, JPI filed another refund claim seeking $22,863 for the period of March 10, 2012 through August 1, 2012. Again, JPI continued paying sales tax to Xerox after filing its claim while Massuda continued to evaluate JPI's records.

An auditor in the Comptroller's Business Tax Audits Section was assigned both refund claims. Between July 2012 and May 2013, the auditor reviewed JPI's tax returns, general ledger, invoices, and samples of materials printed on the printers, and visited the Eastern Shore printing facility. In January 2013, after Massuda became confident that JPI had the records to back up its claim that the printing machines met the criteria for the exemption, but prior to the auditor concluding his field audit, JPI finally stopped paying sales tax to Xerox on the printers.

The auditor concluded his audit and the Refund Supervisor at the Comptroller's Office issued a denial letter for both refund claims on May 15, 2013. The letter stated the following:

> The . . . application for a refund of sales and use tax has been denied due to the fact that the use of the . . . equipment and materials does not satisfy the State's determination of "used directly and predominantly in a production activity" because most of the materials being produced are not for resale.

The letter further informed JPI of its right to request an informal hearing with the Comptroller.

On May 23, 2013, JPI requested an informal hearing with the Comptroller, which was held before a hearing officer. The hearing officer reversed the auditor's decision on both refund claims, finding that JPI's use of the printers met the criteria for the exemption and that JPI was entitled to a refund of the sales tax. On September 17, 2013 JPI received a check for the first refund claim in the amount of $314,655.83 for the first four years of sales tax, and on October 11, 2013, a check for the second claim in the amount of $22,863 for the period of March 2012 to August 2012. No interest was paid on the sales tax refunds. Later, the hearing officer issued two Notices of Final Determination which concluded that, although the Comptroller had approved the refund claims, JPI was not entitled to recover interest from the State.

Soon after, JPI appealed the Comptroller's final determination on the issue of interest to the Maryland Tax Court ("Tax Court"), and on August 19, 2015 the court held a hearing. The Tax Court issued its final determination and memorandum opinion on February 18, 2016, requiring the Comptroller to pay interest on the refunds, which we review in detail below. The Comptroller filed a petition for judicial review with the Circuit Court for Anne Arundel County. Following arguments from both parties on November 14, 2016, the circuit court affirmed the Tax Court's decision. The Comptroller appealed to this Court.

## DISCUSSION

The issue before us on appeal is whether there was substantial evidence in the record before the Tax Court to support its conclusion that JPI is entitled to interest on its refund of sales tax. Whether JPI's use of the printers met the criteria for exemption involved

3

measuring what proportion of its printed materials were for sale or resale[1] based on sample materials and JPI's own records. There is no dispute that JPI's use of the printers met the exemption and that it was entitled to a refund of the sales tax it paid during the relevant time periods. The paramount question at stake is whether JPI's error in paying the tax was "attributable to the State." For the reasons discussed below, we hold that no substantial evidence in the record before the Tax Court supported its conclusion that JPI's error in paying the tax was attributable to the State, and therefore, we reverse.

We review decisions of administrative agencies directly, looking "through" the circuit court's decision. *Kor-Ko Ltd. v. Md. Dep't of the Env't*, 451 Md. 401, 409 (2017) (quoting *People's Counsel for Baltimore Cnty. v. Surina*, 400 Md. 662, 681 (2007); *see also Comptroller of Treasury v. Sci. Apps. Int'l Corp.*, 405 Md. 185, 192 (2008) (Citation omitted) [hereinafter *SAIC*]. Because the Tax Court is "an adjudicatory administrative agency," "decisions of the Tax Court receive the same judicial review as other administrative agencies. *Gore Ent. Holdings*, 437 Md. at 503 (citing *Frey*, 422 Md. at 136)). "When the Tax Court interprets Maryland tax law, we accord that agency a degree of deference as the agency that administers and interprets those statutes." *Comptroller of the Treasury v. Wynne*, 431 Md. 147, 160 (2013) (citing *Comptroller v. Blanton,* 390 Md. at 533–35 (2006)).

---

[1]     To allay any confusion, we refer simply to printed materials that are "for sale" and not "for resale" in the context of JPI's request for a sales tax exemption.

The Court of Appeals in *Kor-Ko Ltd.* provided three areas of inquiry for appellate courts in reviewing administrative agency decisions: (1) whether "the findings of fact made by the agency are supported by substantial evidence in the record made before the agency;" (2) whether the agency "commit[ed] any substantial error of . . . substantive law in . . . formulating its decision;" and (3) whether the agency act[ed] arbitrarily or capriciously in applying the law to the facts."[2] *Kor-Ko Ltd.*, 451 Md. at 411-12 (quoting *Md. Bd. of Pub. Works v. K. Hovnanian's Four Seasons at Kent Island, LLC*, 425 Md. 482, 514 n. 15 (2012)). We treat an administrative agency's decision as "*prima facie* correct" and "review the evidence in the light most favorable to the agency." *SAIC*, 405 Md. at 192-93 (Citation omitted). Additionally, the Court in *SAIC* reiterated the standard that "[w]hen we review an agency decision that is a mixed question of law and fact, we apply 'the substantial evidence test, that is, the same standard of review it would apply to an agency factual finding.'" 405 Md. at 193 (quoting *Longshore v. State*, 399 Md. 486, 522 n. 8 (2007)) (Internal quotation marks omitted).

## II. The Sales Tax Exemption and Exception to the Comptroller's Duty to Pay Interest

Pursuant to § 11-102(a)(1)-(2) of the Tax-General Article ("TGA"), Md. Code (Repl. Vol. 2016), "[e]xcept as otherwise provided in [Title 11], a tax is imposed on . . . a

---

[2]     This standard of review applies when we review a "proto-typical quasi-judicial agency decision." *Kor-Ko Ltd.*, 451 Md. at 423 n. 9 (2017). An agency's action is "quasi-judicial" when "the act or decision is reached on individual, as opposed to general, grounds" and "there is a deliberative fact-finding process with testimony and the weighing of evidence." *Id.* at 409 (quoting *K. Hovnanian's Four Seasons at Kent Island, LLC*, 425 Md. at 515).

retail sale in the State; and . . . a use, in the State, of tangible personal property or a taxable service." One exception to the requirement to pay sales tax is in § 11-210(b):

> The sales and use tax does not apply to a sale of: (1) tangible personal property used **directly and predominantly in a production activity** at any stage of operation on the production activity site from the handling of raw material or components to the movement of the finished product, if the tangible personal property is not installed so that it becomes real property . . . .

TGA § 11-210(b) (Emphasis added). The Code of Maryland Regulations ("COMAR") defines "production activity" as -- "[a]ssembling, manufacturing, processing, or refining tangible personal property for sale or resale."[3] COMAR 03.06.01.32-2(B)(1)(a)(i). Personal property items are "used directly and predominantly in a production activity" if:

> (a) [the] [u]se of the property is integral and essential to the production activity, occurs where the production activity is carried on, and occurs during the production activity; and

> (b) [p]roperty used both in production activities and administrative, managerial, sales, or any other operational or nonoperational activities is **used more than 50 percent of the time directly in production activities**.

COMAR 09.06.01.32-2(B)(2) (Emphasis added). Accordingly, under the circumstances of the present case, JPI could meet the criteria for the exemption if JPI used the printers "more than 50 percent of the time" to manufacture printed materials that were "for sale or resale." *See* TGA § 11-210(b); COMAR 03.06.01.32-2(B)(1)(a)(i) and (2).

---

[3] The term "production activity" is also defined under TGA § 11-101(f)(1) as "assembling, manufacturing, processing, or refining tangible personal property for resale . . . ."

6

When a taxpayer "erroneously pays to the State a greater amount of tax, fee, charge, interest, or penalty than is properly and legally payable," the taxpayer may file a claim for refund "with the tax collector who collects the tax." TGA § 13-901(a)(1). Further, the taxpayer may be entitled to interest on the amount of the refund under certain circumstances, as provided in § 13-603(a):

> Except as otherwise provided in this section, if a claim for refund under § 13-901(a)(1) or (2) or (d)(1)(i) or (2) of this title is approved, the tax collector shall pay interest on the refund from the 45th day after the claim is filed in the manner required in Subtitle 9 of this title to the date on which the refund is paid.

TGA § 13-603(a).

A significant exception to the State agency's obligation to pay interest is that "[a] tax collector may not pay interest on a refund if the claim for refund is: . . . based on . . . an error or mistake of the claimant not **attributable to the State** or a unit of the State government . . . ." TGA § 13-603(b)(2)(i) (Emphasis added). JPI paid sales tax on the printers when it claimed it was not due, but argued before the Tax Court that it was entitled to interest on the refund because the error was "attributable to the State."

## III. The Circuit Court Erred in Upholding the Tax Court's Decision to Require the Comptroller to Pay Interest to JPI.

The Tax Court provided the following findings of fact:

> [JPI] was aware of the exception but determined that equipment was not used directly and predominantly in a production activity. However, [JPI] knew or should have known whether the machines were used directly and predominantly in the manufacturing of the brochures. The [Comptroller] was not in

7

a position to make any determination until after a field audit.[4]

[. . .]

> There was no convincing evidence that the various exhibits introduced during the informal hearing were any different than what was provided to [the auditor] during the course of the sales tax audit. Apparently, after reviewing the same documentation and information, the Hearing Officer decided that the printing equipment did qualify as a production activity within the meaning of COMAR 03.06.01-32-2C, and was therefore, not subject to sales tax.

In issuing its final determination, the Tax Court's rationale was as follows:

> The auditor determined, after numerous material and papers were reviewed, that the leased equipment was not used directly or indirectly in a production activity. This determination by the field auditor supports [JPI's] position that its error or mistake in paying the tax was reasonable. Moreover, it is important to note that the Hearing Officer who granted the refund also reviewed the same material considered by the field auditor. The Court agrees with [JPI] that based on its understanding of the law, the Petitioner properly paid the tax in order to avoid penalty and not run afoul of the [State's] regulation.

> The fact that the field auditor and his supervisor agreed with [JPI], that the tax was due, supports [JPI's] view that the mistake of [JPI] in paying the tax was attributable to the State. [JPI] exercised reasonable judgment and should not be penalized when the auditors of the State wrongly concluded that the tax was due. [ . . . ]

> The Court of Appeals in *Comptroller v. SAIC*, 405 Md. 185 (2008) adopted the Tax Court's standard [articulated in *DeBois Textiles Int'l v. Comptroller*, Income Tax No. 1630 (Md. Tax Aug. 23, 1985)] for determining "what makes an error or mistake 'attributable to the State'" . . . :

---

[4]   Initially, the Tax Court's findings of fact appeared to acknowledge that the error in paying the sales tax was attributable only to JPI. Based on the different findings of the auditor and the hearing examiner, however, the Tax Court found the error to be "attributable to the State."

> "The Tax Court stated that '[a]n error is attributable to the State when a taxpayer using reasonable judgment under the circumstances is led by the laws, regulations, or policies expressed by the State to the mistaken conclusion that the tax is owed.'"

> \* \* \*

> In the present case, the Respondent denied the claims after it had been provided with significant documentation and examples of the products produced at the Petitioner's printing facility. [ . . . ] Just as in SAIC case, it is illogical that a taxpayer could be said to have made an error not attributable to the State where the State took the position that the taxpayer was not entitled to a refund after spending months considering the taxpayer's claim for refund.

> The Court finds that the Petitioner used reasonable judgment under the circumstances, and was led by the laws, regulations or policies expressed by the State to the mistaken conclusion that the tax was owed.

The Tax Court's decision in this case relied principally on the holding in *SAIC* in which the Court held that the Comptroller's final determination letter provided substantial evidence that the error was "attributable to the State" -- the second prong of the exception to the Comptroller's obligation to pay interest on tax refunds. *See* TGA § 12-603(b)(2)(i). Based on *SAIC* and the *DeBois* standard, the Tax Court reversed the Comptroller's decision to deny interest on the two refund claims and required that interest be paid.

A. **The *DeBois* Standard and the Holding of *SAIC* on Error that is "Attributable to the State"**

The *DeBois* standard arose out of a Tax Court decision in which the taxpayer, a domestic international sales corporation (DISC), was entitled to apportion part of its

9

income outside of the State of Maryland, but erroneously paid tax on 100 percent of its income. *See id.* At the time DeBois paid the tax, the state of the law in Maryland on whether DISCs were permitted to apportion income outside of the State was uncertain. Once our courts settled the issue, DeBois filed an amended return requesting a refund. After initially denying the request, the Comptroller settled with DeBois, agreeing to pay a partial refund of $44,728.36, but refused to pay interest. Interpreting the meaning of "attributable to the State" in a predecessor to TGA § 13-603(b)(2),[5] the Tax Court articulated what we refer to as the *DeBois* standard: "[A]n error is attributable to the State when a taxpayer using reasonable judgment under the circumstances is led by the laws, regulations, or policies expressed by the State to the mistaken conclusion that tax is owed." *SAIC*, 405 Md. at 201 (quoting *DeBois*, 1985 WL 6117, at *1). The Tax Court in *DeBois* then applied that standard in its decision:

> In the instant case, Petitioner's error consisted of its belief that DISCs filing Maryland income tax returns must report and pay tax on 100% of their income. This false impression was a reasonable interpretation of the State law and policy because the issue of whether or not DISCs could apportion part of their income outside the State had not been decided by the courts at the time Petitioner filed its returns and paid the tax. *During that time the Comptroller insisted that DISCs report 100% of their income on their Maryland returns and any DISC which failed to comply was appropriately assessed.* It was not until 1983 that this Court rendered a decision which held that DISCs are entitled to apportion part of their income outside the State. Thus Petitioner's mistake was attributable to the State and Section 310(c) mandates that interest be paid on the resultant refund.

---

[5]     *See* Md. Code, Article 81, § 310(c) (1957, 1980 Repl. Vol.).

10

*SAIC*, 405 Md. at 201-02 (quoting *DeBois*, 1985 WL 6117, at *1).

Because the Tax Court found that DeBois was "led by the laws, regulations, or policies expressed by the State to the mistaken conclusion that tax was owed," the error in paying the tax on all of its income, and the basis of the refund claim, was "attributable to the State." *See id.* at 202 (citing *DeBois*, 1985 WL 6117, at *1). A critical finding in *DeBois* was that, at the time DeBois paid the tax, the State's policy and its application of the law on the issue was erroneous. Before the new Tax Court ruling that settled the issue, therefore, it was reasonable for DeBois to assume that the State would continue to apply the same erroneous policy to DeBois, despite its own knowledge of its status as a DISC.

The Court of Appeals in *SAIC* reviewed a decision of the Tax Court in which it had applied the *DeBois* standard. *SAIC*, 405 Md. at 202. Similar to *DeBois*, the Tax Court focused its findings of fact on what prompted SAIC's erroneous payment of the tax. In 1995, SAIC -- a research and engineering firm incorporated in Delaware and headquartered in California -- purchased 100 percent of shares of stock in National Solutions, Inc. (NSI). SAIC reincorporated NSI in Delaware and left its principal headquarters in Virginia. NSI provided internet domain registration services worldwide and held valuable rights to act as the exclusive registrar for internet domain names with ".com" and other common endings. After selling almost a quarter of its NSI shares in 1997, SAIC sold another 9,000,000 of its NSI shares in 1999, which resulted in a $715,850,753 capital gain.

In 2000, SAIC reported the capital gain on its Maryland income tax return for the 1999 tax period and paid $4,274,519 in taxes to the State. In 2003, SAIC amended its 1999 return, seeking a total refund of the taxes paid on the capital gain, asserting that the stock

"lacked a sufficient nexus to Maryland for the gain to be taxable under the United States Constitution and Maryland law."[6] *Id*. at 189. The Comptroller denied the claim for refund on December 18, 2003 in a final determination letter stating, in part, "The State of Maryland does not allow a subtraction for the exclusion of capital gain from the sale of NSI shares so we are unable to allow the requested adjustment."

The Court of Appeals in *Hercules* provided that "Maryland may not tax income earned outside its borders, even on a proportional basis, unless there is a 'rational relationship between the income attributed to the State and the intrastate values of the enterprise.'" *Hercules*, 351 Md. at 112 (quoting *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 166 (1983)). The Court in *Hercules* provided that the necessary nexus "usually is satisfied by demonstrating the existence of unitary business, part of which is carried on in the taxing state to demonstrate the existence of a unitary business." *Hercules*, 351 Md. at 109. The U.S. Supreme Court, in *Allied Signal, Inc. v. Dir., Div. of Taxation*, held that an investment in a subsidiary does not render it part of a "unitary business" where it served only as an "investment," as opposed to an "operational," function. 504 U.S. 768, 784 (1992). In a decision on SAIC's refund claim only, the Tax Court determined, based on the Supreme Court's guidance in *Allied-Signal*, that "there was no nexus linking the gain realized through the sale of NSI stock to any of [SAIC's] activities in Maryland."

---

[6]   See *Hercules v. Comptroller*, 351 Md. 101, 109 (1998), holding that "to levy a tax upon [an entity's] capital gain from the sale of stock, there must be some nexus linking this income to activities within the state."

*SAIC v. Comptroller of the Treasury*, No. 04-IN-OO-0632, 2006 WL 2507134 (Md. Tax, May 11, 2006).

In the Tax Court's subsequent decision on the issue of whether interest had to be paid on the refund, the court found that at the time of SAIC's erroneous payment of the tax, the Comptroller had maintained a policy that was inconsistent with the law. As evidence that the Comptroller had applied an erroneous policy when SAIC paid the tax, the Tax Court pointed to the Comptroller's final determination letter, in which the reason asserted for the denial was that "[t]he State of Maryland does not allow a subtraction for the exclusion of capital gain."

The Court of Appeals affirmed the Tax Court's decision to reverse the Comptroller's denial of interest on SAIC's refund claim. *SAIC*, 405 Md. at 206. The Court set out the proper interpretation of the exception in TGA § 13-603(b):

> For this exception to apply to a refund claim, the claim must satisfy two elements: 1) it must be an error or mistake of the claimant, *and* 2) it must not be attributable to the State or a unit of the State government. If a claim does not meet one of those two elements, *i.e.*, it is not an error of the claimant or it is an error attributable to the State, interest on the refund must be paid.

*Id.* at 199. On appeal, the Comptroller had argued that "an error or mistake cannot be 'attributable' to the State unless it was caused by an assessment or other direct action taken by the State during the claimant's original tax filing process." *Id.* at 203. The Court pointed out, however, that the holdings of *Fairchild* and *Davidson* demonstrate that "if the State requires a taxpayer to pay some amount by assessment, and the taxpayer faces penalties

13

for non-compliance, the taxpayer cannot be said to have made a mistake when it pays the required amount." *Id.* at 204. The Court continued,

> If the only scenario in which a taxpayer action is attributable to the State is when the State actively requires the taxpayer to pay a certain amount of taxes, . . . § 13-603(b) would, effectively, allow interest on the refund only where no taxpayer mistake was made. This interpretation renders the phrase "attributable to the State" surplusage, and we therefore reject it.

*Id.*

Regarding the *DeBois* standard, the Court looked to dictionary definitions of "attributable" as guidance and held the following:

> The commonsense understanding of the phrase "attributable to the State" as used in § 13-603(b) means that the mistake or error can be said to be caused by the State. The Tax Court's *DeBois* standard is an articulation of the factual circumstances that signify that an error or mistake could be "set down or th[ought] of as belonging to, produced by, or resulting from; assign[ed] or ascrib[ed] to" the State. The interpretation of "attributable" used by the Tax Court is in keeping with an "ordinary, popular understanding of the English language." [*Bowen v. Cty. of Annapolis*, 402 Md. 587, 613 (2007)].

*Id.* at 203.

The Court of Appeals held that the Tax Court had relied on substantial evidence that, at the time SAIC paid the tax, the Comptroller applied an erroneous policy -- *i.e.*, "the Comptroller's stated position" on whether the State "allow[s] a subtraction for the exclusion of capital gain." *See id.* at 205-06. Recognizing that *Hercules* was decided one year prior to SAIC's erroneous payment of the tax, the Court noted that SAIC's sale of NSI stock differed from the taxpayer's circumstances in *Hercules* and, therefore, the Tax Court

was in a better position to determine whether *Hercules* would have given notice to SAIC that the law did not require it to pay the tax. The Court added that "[t]he Comptroller never pointed to, and upon an independent examination we do not find, any evidence to contradict the Tax Court's inference" that the Comptroller applied the erroneous policy stated in the denial letter when SAIC paid the tax. *Id.* at 206.

## B. No Substantive Evidence in the Record that JPI was "Led by" a Law, Regulation or Policy to Pay the Tax

The Tax Court's decision to reverse the Comptroller's denial of interest to JPI, as well as JPI's argument before the Tax Court and before this Court, is based on the holding in *SAIC* affirming the *DeBois* standard as a correct interpretation of the phrase "attributable to the State." *See* TGA § 13-603(b)(2)(i). In addition to affirming this standard, the *SAIC* Court held that the Comptroller's final determination letter denying the refund, which stated a position inconsistent with the law, provided substantial evidence that the Comptroller applied this erroneous policy at the time SAIC paid the tax.

As in *SAIC*, our decision must be based principally on the plain language of TGA § 13-603(b)(2)(i). The issue in this case is whether JPI's refund claim was *based on* an error or mistake of JPI that was "not attributable to the State." Neither party disputes that JPI's payment of sales tax on the printers to Xerox was a mistake. The Tax Court's focus, therefore, was whether JPI's mistaken belief that the tax was owed when it paid the tax was "attributable to the State." *See SAIC*, 405 Md. at 199 ("If a claim . . . is not an error of the claimant or it is an error attributable to the State, interest on the refund must be paid"). Based on the *DeBois* standard, the erroneous payment of the tax would be "attributable to

15

the State" if JPI, "using reasonable judgment under the circumstances [was] *led by* the laws, regulations, or policies *expressed by the State* to the mistaken conclusion that tax was owed." *Id.* at 201. That standard emphasizes the cause of, or what led to, the taxpayer's erroneous payment of the tax.

Because the *DeBois* standard is derived from the requirement that the taxpayer's error be "attributable to the State," a foundational question for the Tax Court was what was the relevant law, regulation, or policy expressed by the State that led to or caused JPI's erroneous payment. Only after the law or policy that led to the error is identified does it become relevant whether the taxpayer used "reasonable judgment under the circumstances." *See SAIC*, 405 Md. at 201. Again, for a taxpayer who mistakenly pays a tax that was not owed to be entitled to interest in addition to a refund, there must be some reason to attribute fault to the State for the taxpayer's error.

The Tax Court relied on or referred to the following undisputed facts in determining that JPI's error in paying the tax through January 2012 was attributable to the State: (1) JPI paid the tax despite knowing of the exemption; (2) JPI "knew or should have known whether the machines were used directly and predominantly in the manufacturing of the brochures"; (3) JPI "paid the tax in order to avoid penalty and not run afoul of the [State's] regulation"; (4) "[t]he [Comptroller's Office] was not in a position to make any determination until after a field audit," which occurred after JPI stopped paying sales tax; (5) the auditor reviewed a considerable amount of documents and information over a period of many months and determined that JPI's use of the printers did not meet the exemption; (6) the auditor continued to maintain his position in his testimony that the use of the printers

did not satisfy the criteria for exemption -- *i.e.*, that less than fifty percent of the materials printed were "for sale or resale"; (7) after the field audit, the Comptroller's Office denied the refund claim based on its conclusion that the majority of items were not for sale; (8) JPI disagreed and requested an informal hearing; (9) "[t]here was no convincing evidence that the various exhibits introduced during the informal hearing" differed from the documentation and information the auditor reviewed; and (10) after an informal hearing, the hearing examiner concluded that a majority of the materials were for sale and that JPI was entitled to a refund pursuant to the statutory exemption.

Assuming the Tax Court's findings of fact were correct and viewing the evidence in the record in a light most favorable to the Tax Court's decision, *see SAIC*, 405 Md. at 192-93, we can find no substantial evidence to support the conclusion that JPI was led by any law, regulation or policy to its mistaken belief that the tax was due when it paid the sales tax. Put differently, we cannot identify what law, regulation or policy JPI could have reasonably relied on in reaching its mistaken belief that the tax was owed. Once JPI was aware of the exemption, the only uncertainty or mistaken belief we can find in the record that prompted JPI's payment of the tax related only to whether JPI could show -- through its own invoices, samples, or other internal records -- what proportion of the materials printed during the relevant time period were for sale. *See* COMAR 03.06.01.32-2(B)(1)(a)(i).

The similarity between this case and *SAIC* is limited to the fact that, in both cases, the Comptroller's Office initially denied the taxpayer's claim for a refund. In *SAIC*, however, the letter referenced by the Tax Court was the Comptroller's final determination

17

of whether SAIC was entitled to a refund. Here, the Refund Supervisor within the Comptroller's Office initially notified JPI that it was going to deny JPI's refund request, but that JPI had the opportunity to request an informal hearing. The Comptroller's Office's final determination, however, after the informal hearing, agreed that JPI was entitled to a refund.

In *SAIC*, the relevant law at issue related to the constitutional question of whether Maryland could require SAIC to pay a tax on a capital gain, even if it had no connection to the taxpayer's activities in Maryland. The taxpayer's uncertainty when it paid the tax related to the Comptroller's policy for exempting capital gains and whether the sale of NSI stock served an "investment" or "operational" function. *Id.* at 189. There, the Tax Court found that the Comptroller's Office had applied an erroneous policy to whether it permitted an exemption under those circumstances at the time that SAIC paid the tax. The Tax Court concluded, therefore, that SAIC had used reasonable judgment in erroneously paying the tax, despite knowing its own circumstances and that the capital gain had no connection to its activities in Maryland.

The Court of Appeals held that the Comptroller's letter, stating an erroneous policy for applying the relevant law, was sufficient evidence of the Comptroller's incorrect position on the issue when SAIC paid the tax. *Id.* at 205-06. This was particularly salient evidence of the Comptroller's policy given the fact that the Comptroller provided no evidence, and the Court of Appeals could find none in the record, to contradict the court's conclusion. *See id.* at 206. Similarly, in *DeBois*, our courts clarified the relevant law after

18

DeBois had already paid the tax; therefore, DeBois's uncertainty regarding whether the tax was due at the time of payment was "attributable to the State." *Id.* at 202.

In this case, however, neither party's view of the meaning and application of TGA § 11-210(b) changed from the time that JPI mistakenly paid the tax throughout the proceedings before the Tax Court. Nor did JPI express any uncertainty about how the exemption would apply to the printers it leased from Xerox. The plain language of the statute and its pertinent regulations were clear. JPI never argued that, when it paid the sales tax, it believed the Comptroller would apply the requirement that the property be "used directly and predominantly in a production activity" in an erroneous way. *See* TGA § 11-210(b)(1). Once it was aware of the exemption, JPI clearly understood that the law provided a quantifiable measure for making that determination -- *i.e.*, the printers must have been "used more than 50 percent of the time directly in production activities." *See* COMAR 03.06.01.32-2(B)(2). JPI knew -- at least, after hiring Massuda -- the criteria it needed to satisfy to show that the printers were exempt from sales tax. In fact, JPI apparently convinced the hearing examiner that more than fifty percent of the materials it printed on the printers were "for sale or resale." There is no indication in the record that any law, regulation, or policy of the State led JPI to conclude that the Comptroller would apply the law any differently at the time it paid the tax.

More specifically, unlike in *SAIC*, the letter that notified JPI that its refund was being denied provided no support for the conclusion that the Comptroller's Office's policy for applying TGA § 11-210(b)(2)(i) was inconsistent with the law when JPI paid the tax. In *SAIC*, the significance of the Comptroller's final determination letter was that the letter

19

provided substantial evidence of the Comptroller's policy, which was an erroneous application of the law. *See SAIC*, 405 Md. at 205-06. In the absence of any evidence to the contrary, the Tax Court in *SAIC* concluded the Comptroller had maintained and applied the same position stated in the letter at the time SAIC paid the tax.

In this case, the letter at issue was sent by the Refund Supervisor, prior to the informal hearing and subsequent final determination, and indicated that it had applied a policy that was consistent with TGA § 11-210(b)(2)(i). The letter stated that JPI's use of the printers "[did] not satisfy the state's determination of 'used directly and predominately in a production activity' *because most of the materials being produced are not for resale.*" (Emphasis added). Indeed, the policy provided in the letter to JPI relied on exactly the same criteria that JPI continues to acknowledge that it was required to satisfy. In other words, the dispute that was later settled at the informal hearing, prior to the Comptroller's final determination, related only to the underlying facts and not how the Comptroller's Office applied the law.[7]

After requesting an informal hearing, JPI had the opportunity to show the Comptroller's Office that more of the printed materials were "for sale or resale" than the

---

[7] In addition, unlike the record before the Tax Court in *SAIC*, there was evidence before the Tax Court in this case that the Comptroller had made public its policy for applying the sales tax exemption. The Comptroller presented evidence that it had published "Business Tax Tip No. 9," which explained what items were exempt. Regarding items that are "used for both taxable and exempt purposes," the publication explained that "the exemption may apply if it is used at least 50 percent of the time, *i.e.* predominantly, in a production activity." In defining "directly and predominantly," it provided that "[t]he 'predominantly' test is met if the property is used more than 50 percent of the time directly in production activities."

auditor initially counted during his field audit and that its use of the printers met the fifty-percent threshold. *See* COMAR 03.06.01.32-2(B)(1)(a)(i). The hearing examiner apparently agreed that more materials were "for sale" than the auditor previously determined, that the proportion of printed materials exceeded fifty percent of JPI's use of the printers, and, therefore, that the printers were "used directly and predominantly in a production activity." *See* TGA § 11-210(b)(1). Pursuant to TGA § 11-210(b)(1), the hearing examiner concluded that the printers were exempt from sales tax. Accordingly, the Comptroller issued a final determination approving the refund, sent refund checks totaling $332,365.00, and did not appeal the hearing examiner's determination before the Tax Court. Particularly where the review of the application included samples representing 31,000,000 pages of printed materials over the course of more than four years of using the printers, it is unsurprising that an informal hearing may have been necessary for JPI to clarify to the Comptroller what materials were for sale and should have been counted towards the fifty percent threshold.

On the issue of interest, the Tax Court's decision that JPI's error in paying the tax was attributable to the State was based primarily on the fact that the hearing examiner was not given any documentation that the auditor had not already had the opportunity to review, and yet, the hearing examiner reached a different conclusion. Additionally, the circuit court upheld the Tax Court's decision, finding the fact that the auditor and hearing examiner reached different conclusions from the same documents to be substantial evidence that the error was "attributable to the State." The auditor's and the hearing examiner's differing calculations of the proportion of printed materials that were for sale,

21

however, bore no relationship to any expressed policy maintained by the Comptroller in applying the exemption in TGA § 11-210(b)(2)(i). That fact certainly did not identify what law, regulation or policy could have reasonably led JPI to the mistaken belief that sales tax was owed at the time JPI paid the sales tax to Xerox.

JPI's error cannot be "attributable to the State" on the sole basis that the hearing examiner, after an informal hearing, counted more materials as "for sale or resale" than the auditor did. This is particularly so where JPI's payment of the sales tax to Xerox occurred prior to the initial decision to deny the refund claim and the Office's stated position for doing so reiterated a proper application of the exemption in TGA § 11-210(b)(1). Both the auditor and the hearing examiner applied the law the same way – some evidence that more than fifty percent of the materials printed were for sale. That they both reviewed the same documents and information provided no evidence that the Comptroller had expressed, maintained, or applied a policy inconsistent with the law during the period when JPI paid the sales tax.

Finally, it is important to clarify the element of "using reasonable judgment under the circumstances" included in the *DeBois* standard for attributing the taxpayer's error to the State. *See SAIC*, 405 Md. at 201. The Tax Court relied on the auditor's initial determination that JPI's use of the printers did not meet the exemption as evidence and provided that "[t]his determination by the field auditor supports [JPI's] position that its error or mistake in paying the tax was reasonable." Further, the Tax Court explained, "[JPI] exercised reasonable judgment and should not be penalized when the auditors of the State wrongly concluded that the tax was due."

22

The phrase "using reasonable judgment under the circumstances" in the *DeBois* standard refers to the taxpayer's mistaken conclusion based on a law, regulation, or policy. In reaching its conclusion that the taxpayer's error was attributable to the State, the Tax Court in *DeBois* explained, "[the taxpayer's] false impression was *a reasonable interpretation of the State law and policy* because the issue of whether or not DISCs could apportion part of their income outside the State had not been decided by the courts at the time Petitioner filed its returns and paid the tax. The Tax Court in *SAIC* determined that SAIC used reasonable judgment in erroneously paying the tax, despite knowing that the capital gain had no connection to Maryland, because "the Tax Court inferred from the Comptroller's letter and subsequent denial of SAIC's appeal that the State's laws and policies at the time SAIC filed the original return required that SAIC pay tax on the sale of NSI shares." *SAIC*, 405 Md. at 205.

There is no evidence in the record that could support the conclusion that JPI, using reasonable judgment, misinterpreted, misunderstood, or was uncertain about the law or how it applied. Even if JPI had claimed that it was initially uncertain about what proportion of the materials printed had to be for sale to meet the exemption's criteria, it could not be said to have used reasonable judgment under the circumstances in reaching a mistaken understanding of the law. The statute and the regulations regarding the exemption from sales tax were clear, and JPI never claimed to misunderstand the law, or more importantly, that the Comptroller maintained a policy in applying the law that was inconsistent with the exemption statute.

23

Clearly, it is reasonable to pay any tax the taxpayer believes is owed to the State. The risk of penalties and other consequences make that decision especially prudent when the taxpayer is not confident from its review of its own information whether it meets the criteria for an exemption. The reasonableness of paying a tax, however, is present in every case in which the taxpayer believed it was owed at the time it was paid and later learns its belief was mistaken. The statute, itself, makes clear that the taxpayer's mistaken conclusion must be "attributable to the State." TGA § 13-603(b)(2)(i). Requiring interest to be paid every time a taxpayer unreasonably misinterprets the law or fails to evaluate its own circumstances relevant to an exemption would render this second prong of the statute meaningless. As the Court in *SAIC* explained, "[t]he commonsense understanding of the phrase 'attributable to the State' as used in § 13-603(b) means that the mistake or error can be said to be caused by the State." 405 Md. at 203. To be entitled to interest, therefore, it is not enough to show that the taxpayer misunderstood the law when the tax was paid. The State must, in some way, be at fault for the error.

In this case, JPI's Tax Director understood the statutory exemption, discovered JPI's error soon after being hired, applied for a refund on behalf of JPI, and after clarifying the total proportion of materials for sale at an informal hearing, recovered more than $337,000 in sales tax that the company had erroneously paid. Where the error of paying the tax was completely within the knowledge and control of the taxpayer, however, and no law, regulation, or policy of the State caused the taxpayer's error, the Comptroller may not pay interest in addition to the refund.

Upon our review of the record before the Tax Court, we cannot conclude that any substantial evidence supported the Tax Court's determination that JPI was "led by the laws, regulations, or policies expressed by the State to the mistaken conclusion that tax [was] owed." *See SAIC*, 405 Md. at 192. Accordingly, the circuit court erred in affirming the Tax Court's decision that JPI was entitled to interest on the refund. We, therefore, reverse.

**JUDGMENT REVERSED. CASE TO BE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR REMAND TO THE MARYLAND TAX COURT FOR ENTRANCE OF A JUDGMENT AFFIRMING THE DECISION OF THE COMPTROLLER OF THE TREASURY. COSTS TO BE PAID BY APPELLEE.**